**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:

I, Brandon Harris, being first duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant to search 5230 Elaine Drive, Charleston, West Virginia, 25306, and an unattached shed located on the property (hereinafter referred to collectively as "SUBJECT PREMISES"), a residence used by Michael Ginther (hereinafter "GINTHER").  As set forth herein, probable cause exists that GINTHER has committed and continues to commit violations of the following offenses: (i) possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1); and, (ii) felon in possession of a firearm or ammunition, in violation of 18 U.S.C. § 922(g)(1). Further, probable cause exists that evidence, proceeds, and fruits and instrumentalities of those offenses are currently located within the SUBJECT PREMISES more particularly described in ATTACHMENT A.

2.    I am a Special Agent employed by the United States Department of Justice, the Drug Enforcement Administration (hereinafter "DEA"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am

authorized to apply for federal search warrants. I have been employed as a Special Agent of the DEA over four years, and I am currently assigned to work drug investigations in the Charleston, West Virginia District Office in Charleston, West Virginia. In my capacity as a DEA Agent, my responsibilities include investigating drug violations, money laundering and firearm related drug offenses. Previously, I was a police officer in Lexington, Kentucky for approximately seven (7) years. In that capacity, I worked in a specialized unit called Community Law Enforcement Action Response Unit (CLEAR) which focused on street level narcotics and gang related investigations. I have investigated drug trafficking, gangs, violent crimes, and other offenses. I have personally participated in well over 100 arrests and have been involved in securing and executing numerous search warrants as a law enforcement officer.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.  This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this investigation.

**PROBABLE CAUSE**

4.    Based upon the facts of this investigation and the information contained within this affidavit, probable cause exists

that GINTHER is storing controlled substances, drug paraphernalia and firearms in the SUBJECT PREMISES.

5.     On or about August 11, 2023, GINTHER began serving a period of supervised release (hereinafter "S/R") after he was convicted of Conspiracy to Distribute 5 grams or more of methamphetamine before the Honorable Joseph R. Goodwin, District Court Judge. On or about April 10, 2024, Judge Goodwin entered an order authorizing the issuance of a warrant for GINTHER for alleged S/R violations. Those violations included that GINTHER was in possession of a firearm on or about March 19, 2024, during a traffic stop conducted by the West Virginia State Police. During the traffic stop, GINTHER allegedly stated that a firearm was contained within a bag located between his feet. Troopers allegedly recovered from the bag a loaded Taurus G3 9mm handgun.

6.     According to the United States Probation Department (hereinafter "PROBATION DEPARTMENT"), GINTHER resided at his parents' home located at 5230 Elaine Drive, Charleston, West Virginia, 25306. It was further learned through the PROBATION DEPARTMENT that GINTHER often stayed in the shed on the property. It should be noted that the shed is located behind the residence, is separated from the residence by a deck and is the only shed/outbuilding on the property.

7.     On April 24, 2024, members of the United States Marshal's Service and at least one Task Force Officer traveled to

3

5230 Elaine Drive, Charleston, West Virginia, 25306, to arrest
GINTHER on the aforementioned warrant. Upon arriving, officers
encountered GINTHER'S mother who stated that GINTHER was located
in the shed. Officers further saw a woman, later identified as
Brittney Light (hereinafter "LIGHT"), walk toward them from the
direction of the shed. LIGHT also told officers that GINTHER was
located inside the shed. LIGHT further stated that GINTHER was
currently weighing and packaging heroin to distribute when
officers arrived. LIGHT later told officers that she had resided
with GINTHER in the shed for approximately one month.

8.    Officers knocked on the door of the shed and identified
themselves as law enforcement officers. No one responded. Officers
forced entry into the shed. The shed includes window air
conditioning unit, a bed, a refrigerator, television, closet and
some personal amenities.

9.    GINTHER was found hiding in the closet. On the floor
of the shed, near the closet, a pistol was in plain view. Officers
retrieved the firearm for officer safety and discovered the pistol
was loaded but a round was not chambered. Further, before finding
GINTHER in the closet, officers looked underneath the bed. While
looking under the bed, a quantity of suspected methamphetamine was
seen in what appeared to be inside of a jar or bowl, which is
believed may have been knocked over or attempted to be concealed
after officers knocked and announced their presence.

10. In addition, a large quantity of suspected methamphetamine in the approximate shape and size of a softball was located by law enforcement in GINTHER'S pocket when he was searched incident to his arrest. A field test was performed on a sample of the substance that was positive for methamphetamine. In addition, by the sidewalk leading to the front of the residence, a box for a Glock handgun was seen by officers in plain view.

11. After GINTHER was arrested, LIGHT told me that GINTHER takes methamphetamine from the shed into the house due to his paranoia. Furthermore, LIGHT stated last night GINTHER removed a rifle or long gun from the shed and took it into the house. It should be noted, a third person admitted to an officer on the property that he had taken a long gun from the residence recently and removed it from the property. LIGHT also stated that GINTHER has distributed heroin and methamphetamine while residing on the property after his S/R commenced.

## BACKGROUND: ITEMS TO BE SEIZED

12. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a) Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging,

weighing, cutting, testing, distributing, and manufacturing controlled substances.

b) Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time, even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and co-conspirators.

c) Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences.

d) Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means including: placing assets in the names of other individuals so that they may avoid detection while maintaining control; laundering the money through what appears to be a legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

e) Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities or purchased with the cash earned from such trafficking.

f) Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their

person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.  In addition, firearms constitute an object of a crime when they are possessed by a convicted felon.

g) Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting, or controlling the residence and premises.

h) Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i) Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-

surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j) Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

13. Documents/Records: It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the SUBJECT PREMISES despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

9

14.   Cellular Telephones: In this case, there is probable cause that individuals utilize cellular telephones to facilitate their drug trafficking activities. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow for their subscribers to access their device over the internet and remotely destroy all of that data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. Conversations can be hidden

10

in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer. Consequently, this warrant seeks authorization to seize and secure cellular telephones found at the SUBJECT PREMISES and to search or analyze the same off-site by one or more trained examiners.

15.   I believe that the items described in Attachment B will provide evidence of the events set forth in this affidavit and that such articles can be found at the SUBJECT PREMISES despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

Further your Affiant sayeth naught.

Respectfully submitted,

Brandon Harris, Special Agent
Drug Enforcement Administration


Sworn to me by telephone or other reliable or other reliable electronic means on April 24th, 2024.

DWANE L. TINSLEY
United States Magistrate Judge

12